FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2019 JAN 19 PM 3:01

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

ALBERT MORRIS,                    *
                                  *
        Plaintiff,                *
                                  *
                                  *    CIVIL ACTION NO. 316-046
    v.                            *
                                  *
DAVID J. SHULKIN,                 *
SECRETARY, DEPARTMENT OF          *
VETERANS AFFAIRS,                 *
                                  *
        Defendant.                *

---

O R D E R

---

Plaintiff Albert Morris ("Plaintiff"), a black male who
is proceeding pro se, is suing his former employer, the
Department of Veterans Affairs, under Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.,
and the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d)
et seq. The case is presently before the Court on Defendant's
motion for summary judgment as to all claims. Upon
consideration of the record evidence, the relevant law, and
the parties' briefs, the motion for summary judgment is
GRANTED.

## I. BACKGROUND[1]

### A. Factual Background

Plaintiff is a black male born April 18, 1951. In May 2009 Plaintiff was offered a position as Staff Radiologist at the Carl Vinson VA Medical Center in Dublin, Georgia. Newly hired physicians must apply to the hospital "Professional Standers [sic] Board for Credentialing and Privileging" for an appointment of clinical privileges. See (Def.'s Mot. for Summ. J., Doc. No. 24, Ex. 4.) Privileges are generally awarded for two years. Plaintiff applied for privileges as a full-time radiologist and was approved through May 2011.

When Plaintiff began his employment, Dr. Kush Kumar was his immediate supervisor. In January 2010, Plaintiff reported

---

[1] The factual and procedural background of this case is provided in great detail in Defendant's Statement of Material Facts (doc. no. 24-1), with each statement properly supported by citation to the record. (See Loc. R. 56.1, S.D. Ga.) Plaintiff responded to the Statement of Material Facts, admitting most of the facts. Most of the facts not admitted are simply qualified with Plaintiff's version of events with no citation to the record or with conclusory allegations of mistreatment or lack of process. It is Plaintiff's burden to rebut the Statement of Material Facts, not with conclusions and unsupported assertions of his own recollection and understanding, but with citations to record evidence that create genuine issues of material fact with respect to his claims of discrimination and harassment. Plaintiff has wholly failed to do this as discussed more fully infra. Suffice to say here that the Court relies heavily upon the Statement of Material Facts in its recitation of the factual and procedural background of this case and will therefore recite the background with limited citations. The Court will note any disagreement by Plaintiff for purposes of relaying his side of the story, but too often his version is either irrelevant to the legal issues in the case or unsupported by record evidence. Simply put, this is a case in which the deficiencies in Plaintiff's legal claims become apparent from laying out the facts. Evidence of racial or gender discrimination is simply not there; Plaintiff has wholly failed to rebut the non-discriminatory reasons that he was disciplined and ultimately terminated.

Dr. Kumar for patient abandonment. According to Plaintiff, this is where his employment problems began.

About this same time, Dr. Kumar informed Plaintiff that he wanted him to read MRIs as part of his job responsibilities. (Pl.'s Dep. of Mar. 14, 2017, Doc. No. 24-2, at 38.) According to Plaintiff, MRIs had never been interpreted at the facility, and MRIs were not listed on the list of modalities when he applied for the position. (Id.) In fact, Plaintiff had not read MRIs in three or four years prior to his employment at the VA. (Id.) Moreover, Plaintiff believed he should be compensated more for reading MRIs since that modality was not listed in the job announcement. (Pl.'s Dep. of Feb. 9, 2015, Doc. No. 24-3, at 46-48.)

On April 5, 2010, Plaintiff received a letter placing him on paid non-duty status "pending a decision on whether a Summary Review is appropriate." (Def.'s Mot. for Summ. J., Ex. 8.) On July 30, 2010, Plaintiff's privileges were summarily suspended upon the recommendation of the Chief of Staff, Dr. Nomie Finn, who had reason to be concerned that "aspects of [Plaintiff's] clinical competency do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare." (Id., Ex. 9.) The letter further provided: "An administrative review of your imaging examinations found a significant number of major

disagreements in relation to spinal MRIs and CTs.[2]  This suspension is in effect pending a comprehensive review of your imaging examinations." (Id.)  Plaintiff does not dispute receiving the letter or the fact of suspension, nor the fact that the committee made the stated findings; rather, he claims the committee was not independent and the process was flawed and not in accordance with written policy recommendations. (See generally Pl.'s Resp. to Def.'s St. of Material Fact, Doc. No. 33, ¶¶ 21-22.)  According to Plaintiff, he received the July 30, 2010 letter one week after Dr. Kumar was informed of the complaint about patient abandonment.[3]  (Id. ¶ 21.)

For reasons unknown, Plaintiff remained on paid administrative leave for one year, until August 2011.  When Plaintiff returned, the VA had hired two Staff Radiologists: Drs. Edward Silverman and Aida Karahmet.  Dr. Silverman had been assigned to Plaintiff's former office.  Indeed, at the time of his return, there were no vacant offices in the Radiology Department (Building Four on the VA campus); so, Plaintiff was placed in Building Six pending construction of his new office in Building Four.  While the VA claims that

---

[2]   More specifically, a committee was formed to evaluate imaging examinations at the VA.  (Def.'s Mot. for Summ. J., Ex. 11.)  The committee consisted of three imaging service line chiefs from Birmingham (AL), Columbia (SC) and Augusta (GA).  (Id.)

[3]  Plaintiff has produced no evidence regarding when Dr. Kumar learned of Plaintiff's January 2010 complaint.

4

Plaintiff's workspace in Building Six was similar to all other radiologists, Plaintiff complains that his office did not have room darkening capabilities, only had 2 bank x-ray displays rather than 4, and was not within range of departmental paging and other forms of communication within the radiology department. (Pl.'s Resp. to Def.'s St. of Material Fact, Doc. No. 33, ¶ 33.) Plaintiff further complains that other arrangements could have been made to accommodate his office in Building Four, such as moving the part-time radiologist or the chief technologist, both of whom were female. As soon as his office was fully constructed and suited with furniture and equipment, Plaintiff was moved back to Building Four in roughly July 2012.

Also upon Plaintiff's return in August 2011, he was placed under the supervision of Associate Chief of Staff, Dr. Raman Damenini. On October 28, 2011, Dr. Finn informed Plaintiff that he must undergo a Focused Professional Practice Evaluation ("FPPE"). The FPPE process assures a physician is competent so that clinical privileges can be maintained and quality of care for patients can be assured.[4] The FPPE was implemented because the medical staff was concerned by past

---

[4] Plaintiff was initially notified of the FPPE process by Dr. Damenini on October 12, 2011. However, Plaintiff objected to the initial FPPE because it would require 100% acceptable readings, which he considered unattainable. Consequently, the VA issued a revised FPPE on October 28, 2011.

discrepancies in Plaintiff's case readings and because too much time had elapsed since Plaintiff practiced "at an acceptable productivity level." Plaintiff was told that the process is completed on any provider who had recently been granted clinical privileges and that his clinical privileges depended upon the FPPE outcome. Plaintiff's privileges were granted for six months, from November 4, 2011 to May 3, 2012.[5]

On February 28, 2012, Plaintiff successfully completed the FPPE upon demonstrating an acceptable level of professional competence. The Medical Evaluation Committee, however, recommended an Ongoing Professional Practice Evaluation ("OPPE") for Plaintiff. The OPPE is performed twice a year and is less stringent than the FPPE. The OPPE is a requirement for all physicians to confirm the quality of care delivered.

On May 3, 2012, Plaintiff's clinical privileges were extended for only a ninety-day period, until July 31, 2012.

---

[5] The VA claims there was an error in the first "Privileging Letter," dated November 7, 2011, which states that Plaintiff's privileges would not expire until May 3, 2013. The VA issued another privileging letter on May 5, 2012, which granted Plaintiff clinical privileges for a three-month period: "Your current clinical privileges will expire 7/31/2012." Plaintiff points out that the original Privileging Letter had never been rescinded, yet the issuance of a new Privileging Letter around May 3, 2012 would indicate that there was an error in the original letter. Moreover, Plaintiff re-applied for his clinical privileges on April 27, 2012. In any event, while Plaintiff points out the non-rescission of the original letter, his argument related to the clinical privileges focused solely on the fact that his clinical privileges were only extended for three months rather than the typical two years. In other words, the alleged error is a non-issue.

6

The VA explains that Plaintiff did not have enough peer reviews on file to re-credential him.[6] Accordingly, the VA sent out 15 of Plaintiff's interpretations to three different facilities for peer review. (Def.'s Mot. for Summ. J., Ex. 32, at 8-9 ("[A]ny employee who is being recredentialed has to submit additional information, just like you're starting all over. And so that means that he has to have peer reviews that are up-to-date, current, and he has to have a certain number before we can declare him recredentialed.").) The ninety-day period was granted to allow time for the peer reviews to come back to the VA. (Id. at 10.)

On May 24, 2012, Plaintiff received notification of disagreements with readings of his ultrasound and CT scans through the OPPE process. The VA suspended Plaintiff's clinical privileges for reading ultrasound and CT scans. Plaintiff was allowed to read only plain film while his ultrasounds and CT scans underwent a comprehensive peer review. On July 6, 2012, all of Plaintiff's privileges were suspended due to concerns about his professional competence.

On August 8, 2012, Plaintiff re-applied for clinical privileges. Only plain film privileges were granted pending the outcome of retraining and evaluation. The VA arranged for

---

[6]  As explained by Ms. Annie Hutchinson, Risk Manager at the VA, a physician must be re-credentialed every two years and Plaintiff's original two years had lapsed. (Def.'s Mot. for Summ. J., Ex. 32, at 9.)

Plaintiff to receive individualized, two-week training at the VA in Charleston, South Carolina. Both parties pick and choose favorable statements from the training physician's final report, but his conclusion is unmistakable: "[Plaintiff's] skill as a radiologist functioning independently is questionable and further review is needed, at a minimum. My general impression is that [Plaintiff] would not meet the standards to work independently in my department." (Def.'s Mot. for Summ. J., Ex. 40, at 1-2.)

On October 31, 2012, Plaintiff's supervisor, now Dr. Aml Girgis, instructed him to apply for a full range of privileges in line with the job description of a VA Staff Radiologist. On November 2, 2012, Plaintiff returned his application package requesting only plain film radiograph and fluoroscopy privileges. Plaintiff claims he was concerned about the effect of applying for privileges that would be denied because of the negative effect denials would have on his professional record. (Pl.'s Dep. of Mar. 14, 2017, at 66.) On November 7, 2012, Plaintiff was again instructed to apply for a full range of privileges and warned that his privileges would expire on November 8, 2012. Plaintiff did not timely comply and his privileges expired. On November 9, 2012, the VA informed Plaintiff that he was no longer a member of the medical staff

with clinical privileges.[7]  On December 6, 2012, the VA placed Plaintiff on non-duty status.

Some time later, on November 13, 2013, the VA sent Plaintiff a proposed discharge letter, outlining 24 cases in which Plaintiff demonstrated inadequate clinical competence through incorrect interpretations and/or recommendations.  On August 29, 2014, Plaintiff received a discharge letter, effective September 6, 2014.  The letter stated that Plaintiff was discharged from federal employment because of a demonstration of inadequate clinical competence.

In his deposition, Plaintiff claims that he was subjected to a sham peer review and that the VA, through its Chief of Staff Dr. Nomie Finn, attempted to destroy his career and professional reputation.  (Pl.'s Dep. of Mar. 14, 2017, at 64-70.)  He claims that Dr. Finn is "extremely vindictive" and "emotionally unstable."  (Id. at 67.)

B.  Procedural Background

Plaintiff filed his first EEO claim on August 20, 2010, disputing his placement on administrative leave from April 5, 2010 to August 1, 2011.  He alleged discrimination based on his race, sex and age.  However, because Plaintiff had been

---

[7]  Plaintiff states that he applied for the all the privileges that the VA was "attempting to force" him to apply for on November 11, 2012; however, next to each modality, Plaintiff wrote: "pending successful completion of appropriate proctoring, education, or CME."  (Pl.'s Resp. to Def.'s St. of Material Fact, ¶ 101.)

paid during his 16-month administrative leave, the EEO counselor determined no harm had been caused. Plaintiff did not file a formal EEO complaint at that time.

On May 31, 2012 and January 24, 2013, Plaintiff contacted an EEO counselor again and alleged discrimination based on race, sex and age as well as reprisal for prior EEO activity. Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission on July 20, 2012. The claims accepted for investigation and adjudication were whether Plaintiff was discriminated against as evidenced by the following events:

- The placement in Building Six upon his return to work in August 2011

- Disparity in pay with other radiologists

- Limited approval of clinical privileges (i.e. three months) from May 7, 2012 to July 31, 2012

- Placement on non-duty status on December 6, 2012

(See generally Compl., Case No. 3:16-CV-046, ¶ 9.) On March 1, 2016, the Administrative Judge issued a decision in favor of the VA on all claims. (Id. ¶ 10.)

On October 20, 2014, after the effective date of Plaintiff's termination, Plaintiff initiated an informal EEO complaint. On January 26, 2015, Plaintiff filed a formal charge of discrimination with the EEOC. The claims accepted for investigation and adjudication were whether Plaintiff was

subjected to a hostile work environment as evidenced by the following events:

- Plaintiff's proposed removal in the memorandum of November 13, 2013

- The nine-month period, from November 13, 2013 to August 29, 2014, for the VA to render a decision regarding Plaintiff's proposed removal

- The VA's refusal to allow Plaintiff to sufficiently review or respond to the charges in the proposed removal during the nine-month period

- The termination decision of August 29, 2014

(See generally Compl., Case No. 3:16-CV-026, ¶ 9.) On February 1, 2016, the Administrative Judge issued a decision in favor of the VA on all claims.

On May 5, 2016, Plaintiff, proceeding pro se, timely filed suit against the VA in this Court arising out of his January 26, 2015 EEOC charge. (Case No. 3:16-CV-26, Compl. ¶ 8.) While this complaint references events that took place prior to November 13, 2016, its focus is on the removal notice and events occurring thereafter - particularly the nine-month delay before the ultimate termination decision. (See also Pl.'s Compl., Case No. 3:16-CV-046, ¶ 8 ("Plaintiff has an additional complaint before this Court in Civil Action Number 3:16-CV-026 where the sole claim is Plaintiff's removal from federal service."). The four asserted claims in the case are (1) reprisal for prior EEO activity; (2) race discrimination;

(3) hostile work environment; and (4) violation of due process.

On June 16, 2016, Plaintiff, again proceeding pro se, timely filed suit in this Court arising out of the prior EEO complaint of July 20, 2012 and final adjudication decision of March 1, 2016. (Case No. 3:16-CV-046, Compl. ¶ 10.) In this complaint, Plaintiff focuses on the terms and conditions of his employment as a Staff Radiologist at the VA to include the isolation from other radiologists in Building Six, disparate pay as compared to the other radiologists, assignment of temporary clinical privileges (i.e. three months), the forced application of full clinical privileges, and the placement on non-duty status on November 9, 2012. In other words, this second suit focused on Plaintiff's treatment while he was employed by the VA prior to the proposed removal of November 13, 2013. The four asserted claims in the case are (1) reprisal for prior EEO activity; (2) race discrimination; (3) hostile work environment; (4) violation of due process; (5) and gender discrimination.[8]

The Court consolidated the two cases upon the parties' joint motion on December 27, 2016. Defendant filed the instant motion for summary judgment on July 3, 2017. The

_____

[8]   While Plaintiff apparently mentioned age discrimination in his EEO charges, there is no claim of age discrimination under the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621 et seq. The ages of the various employees will not be further discussed.

Clerk of Court gave Plaintiff notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 26.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied.

On August 14, 2017, Plaintiff filed a response with over thirty exhibits. (Doc. No. 35.) Plaintiff's "brief" is only four pages with not a single citation to the record or legal authority. Attached to the brief is Plaintiff's response to Defendant's Statement of Material Facts, which is discussed in note 1 <u>supra</u>.[9] On August 28, 2017, Defendant filed a reply brief, and Plaintiff filed a sur-reply.

The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

---

[9] Plaintiff previously filed this same brief, exhibits, and response to the Statement of Material Facts three days earlier on August 11, 2011. (<u>Compare</u> Doc. No. 33 <u>with</u> Doc. No. 35.)

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259, 1260 (11th Cir. 2004); Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed a genuine issue as to the material facts of its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is

14

such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at 255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). "The non-moving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Bryant v. Dougherty Cty. Sch. Sys., 382 F. App'x 914, 917 (11th Cir. 2010) (citing Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008); Anderson, 477 U.S. at 249–50)).

### III. LEGAL ANALYSIS

Plaintiff has asserted the following claims in this case: an Equal Pay Act claim, claims of race and gender

discrimination, hostile work environment, and reprisal under Title VII, and an undefined claim for a violation of due process. The Court will discuss each claim in turn.

A. Equal Pay Act

The Equal Pay Act ("EPA") prohibits an employer from discriminating between employees "by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions, except where such payment is made pursuant to . . . a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Thus, a plaintiff must show that he performed substantially similar work for less pay than employees of the other gender. Once the plaintiff makes this showing, the burden falls to the employer to establish a statutory defense.[10]

In this case, the only female comparator to Plaintiff is Dr. Karahmet, who was hired as a Staff Radiologist while Plaintiff was on *paid* administrative leave performing no job duties for the hospital. Dr. Karahmet was hired under the same or substantially similar job announcement as Plaintiff. The

---

[10] An EPA plaintiff need not disprove the defendant's statutory reason or show the asserted reason for the differential pay is pretextual. See Woodard v. Medseek, Inc., 178 F. Supp. 3d 1188, 1199 (N.D. Ala. 2016) (cited source omitted).

parties do not dispute that Dr. Karahmet's starting salary was $10,000 more than the starting salary of Plaintiff the year before. Thus, Plaintiff can establish a statutory violation. The VA, however, has established factors other than gender to justify the pay differential. First, the VA points out that Dr. Karahmet, while not board certified at the time of her hire, became board certified in May 2011, while Plaintiff was still on paid administrative leave. Plaintiff admits that board certification is a qualification that impacts pay. Moreover, Plaintiff admits that Dr. Karahmet performed the majority of MRI readings in the radiology department, a modality that was outside of her job description and that Plaintiff refused to do without additional pay.[11]

In sum, the Court finds that no reasonable jury would conclude that the VA has not affirmatively and indisputably proven that non-gender based reasons justify the pay differential between Plaintiff and Dr. Karahmet.[12] Accordingly,

---

[11] The VA also points out that for significant periods of time while both Plaintiff and Dr. Karahmet worked in the radiology department, Plaintiff's workload was less than his colleagues because his privileges to read more complex film were limited.

[12] It should be noted that Plaintiff also claims that he was treated differently with respect to yearly performance-based bonuses. Given Plaintiff's sporadic and limited scope of duties during his tenure, Plaintiff's failure to receive performance-based bonuses is justified as a matter of law.

the VA is entitled to summary judgment on Plaintiff's EPA claim.[13]

B.  Title VII Claims

Title VII offers broad protection to employees against discrimination in the workplace based upon race and gender. Here, Plaintiff asserts that he disparately treated in several terms and conditions of his employment with the VA and ultimately suffered a discriminatory discharge. Plaintiff also claims he was subjected to a hostile work environment and that the discriminatory treatment constituted an act of reprisal for his prior EEO activity. The VA asserts that Plaintiff has not produced any evidence to support his claims of discrimination and that the real reason he was terminated was because of his poor work performance.

1.  *Disparate Treatment*

Here, Plaintiff claims he suffered race and gender discrimination in the conditions of his employment and in his termination. Under Title VII, a plaintiff asserting a disparate treatment claim must prove that unlawful "animus

---

[13]  A gender-based wage discrimination claim under Title VII would also fail in this case. Under Title VII, once the defendant articulates a legitimate, non-discriminatory reason for the pay differential, the burden shifts to Plaintiff to show that "the reason is either not worthy of belief, or that, in light of the all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason." Woodard, 178 F. Supp. 3d at 1200 (citing Standard v. A.B.E.L. Servs., Inc., 161 F. 3d 1318, 1331-33 (11th Cir. 1998)). Here, Plaintiff has admitted that board certification and performing MRIs outside of the job description justify more pay and has not presented any evidence that the pay differential was more likely motivated by his gender.

motivate[d] a challenged employment decision." <u>Wilson v. B/E</u>
<u>Aerospace, Inc.</u>, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoted
source omitted). The plaintiff may prove this discriminatory
intent either through direct or circumstantial evidence.
<u>Denny v. City of Albany</u>, 247 F.3d 1172, 1182 (11th Cir. 2001).
Because Plaintiff has not produced any direct evidence of
discriminatory intent, he must base his case on circumstantial
evidence. Under these circumstances, the Court employs the
<u>McDonnell Douglas</u>[14] burden-shifting framework, whereby the
plaintiff must first come forward with evidence sufficient to
establish a prima facie case of discrimination. This creates
a rebuttable presumption of unlawful discrimination. <u>E.g.</u>,
<u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254
(1981). The defendant is then called upon to articulate a
legitimate, non-discriminatory reason for its allegedly
discriminatory decision. <u>Id.</u> at 255-56. When the defendant
meets its "burden of production, the presumption of
discrimination is eliminated," <u>Jackson v. Ala. State Tenure</u>
<u>Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005), and the plaintiff
must then produce evidence of "pretext," that is, to show the
proffered reasons are "not the true reasons for the employment
decision," <u>Brooks v. County Comm'n of Jefferson Cnty., Ala.</u>,
446 F.3d 1160, 1162-63 (11th Cir. 2006) (citations and quoted

---

[14]  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

19

sources omitted). "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." Id. at 1162 (quoting EEOC v. Joe's Stone Crab, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002)).

In accordance with the McDonnell Douglas burden shifting analysis, the Court will first look to whether Plaintiff has established a prima facie case of discrimination in the instant case. A plaintiff may establish a prima facie case of disparate treatment by showing that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside his class more favorably. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

The Court will accept, and the VA appears to concede, that Plaintiff can establish the first two elements that he is a member of a protected class (black and male) and was qualified for the position of Staff Radiologist. Plaintiff has also shown that he suffered the following adverse employment actions: (1) Placement in Building Six (apart from the

Radiology Department);[15] (2) Disparity in Pay; (3) Limited Grant of Clinical Privileges (i.e., ninety days); (4) Placement on Paid Administrative Leave; and (5) Termination. The fourth element of the prima facie case, whether other similarly situated employees were treated more favorably, is not so easily presumed however.

"To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). The Court will not delve too deeply here into comparisons with every non-black or female radiologist with respect to each claim, but a few general observations are warranted. First, with respect to the disparity in pay claim, the Court has already dispelled the notion that Plaintiff has a valid female comparator. The record also shows that the male radiologists of a different race than Plaintiff were board-certified and/or had supervisory roles in the department. Thus, there is no valid comparator with respect to Plaintiff's disparity in pay claim. Aside from his placement in Building Six, Plaintiff's other claims of adverse treatment center

---

[15] The VA has argued that the temporary placement in Building Six was not adverse to Plaintiff. The Court need not mire itself in the comparison minutiae of the buildings or, for that matter, in the employees in the radiology department to figure out who should have been temporarily placed in Building Six.

around the punitive or corrective actions taken by the VA upon becoming concerned about Plaintiff's competency. In short, Plaintiff is the only radiologist who had repeated negative peer reviews so that the imposition of limited clinical privileges, placement on administrative leave, and even termination cannot be said to be different than someone outside of his protected class who had similar work performance issues.[16] Nevertheless, for purposes of further discussion, the Court will assume that Plaintiff can establish a prima facie case of discrimination though imposition of the fourth element would appear to preclude all but the claim that Plaintiff was placed in Building Six apart from the others in the radiology department.

Shifting the burden to the employer, the VA has indisputably presented non-discriminatory reasons for each of the employment decisions that have aggrieved Plaintiff. More particularly, the VA has shown that the relocation of Plaintiff was necessary as there was no room for him in Building Four, that any pay disparity was justified, and that the limitation

---

[16] Plaintiff has offered Dr. Richard Stiles as a comparator in the context of the re-credentialing process in the spring of 2012 when he was placed on OPPE and then only granted privileges for ninety days. Dr. Stiles was apparently involved in a medical malpractice suit which settled against him. According to Plaintiff, a "different standard was used for Dr. Stiles" in the re-credentialing process. (St. of Material Fact, Doc. No. 24-1, ¶ 84.) The VA points out that Dr. Stiles was subjected to an FPPE and under his OPPE, Dr. Stiles suffered no discrepancies during his peer-review and his file contained sufficient up-to-date peer reviews on file to allow for his re-credentialing. (Id. ¶¶ 85-86.) Thus, Dr. Stiles is a tenuous comparator.

of privileges, suspension and termination were all based upon the VA's concerns about Plaintiff's competence as revealed in peer reviews and the OPPE process. Thus, the VA has eliminated any presumption of discrimination created by the prima facie case, and the burden now shifts back to Plaintiff to show that the non-discriminatory reasons are pretextual.

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. The plaintiff cannot succeed in demonstrating pretext "by simply quarreling with the wisdom" of the employer's reason or substituting his own business judgment for that of the employer. See Chapman v. Al Transp., 229 F.3d 1012, 1030 (11th Cir. 2000). Instead, the plaintiff "must meet [the employer's] reason head on and rebut it." Id. A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

In determining whether the plaintiff has created a genuine of material fact as to pretext, the Court may not act as a super-personnel department and reexamine the employer's decisions; rather, the Court must limit its inquiry to

"whether the employer gave an honest explanation of its behavior." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). "The inquiry into pretext requires the Court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the [employer]'s proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Crawford, 529 F.3d at 976 (citation omitted).

Plaintiff's case completely fails at this juncture. He has presented no evidence that race or gender was a factor in any decision, nor has he presented evidence of discriminatory animus on anyone's part. The only arguable animus he points to is that of Dr. Kumar after Plaintiff reported him for patient abandonment, but this is not a race- or gender-based allegation. Moreover, while Plaintiff generally claims to have been competent, he has presented no evidence that the negative peer reviews, which led to the challenged employment decisions, were in any way fabricated or false. Indeed, his own perception of his abilities are irrelevant. See Holifield, 115 F.3d at 1565 ("[W]here the employer produces performance reviews and other documentary evidence of . . . poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the

absence of other evidence."). Plaintiff's only "evidence" of pretext is his general assertion that he has been subjected to a "sham peer review" process. Yet, his only support for this theory are his own subjective beliefs and conclusory allegations.

In short, Plaintiff has referred to insufficient evidence that the VA's explanations for its employment decisions are pretextual for either race or gender discrimination. A court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). Instead, the sole concern is whether "unlawful discriminatory animus" motivated the adverse decisions. Id. In this case, Plaintiff presents no evidence from which a jury could find that the VA acted with discriminatory animus. Accordingly, the VA is entitled to summary judgment on Plaintiff's disparate treatment claims.

2.   *Reprisal*

Title VII makes it unlawful for an employer to discriminate against an employee in retaliation for opposing "any practice made an unlawful employment practice [under Title VII]." 42 U.S.C. § 2000e-3(a). Plaintiff contends that adverse employment actions were taken against him in retaliation for his EEO activity.

Where, as here, a plaintiff's retaliation claim is based on circumstantial evidence, the claim is also analyzed according to the burden shifting framework set forth in McDonnell Douglas and its progeny. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010). Thus, in order to survive summary judgment, Plaintiff must set forth a prima facie case to create a presumption of retaliation. Once satisfied, the VA must rebut this presumption of retaliation by articulating legitimate, non-retaliatory reasons for its adverse actions. Plaintiff must then come forward with evidence sufficient to permit a reasonable fact finder to conclude that the adverse action taken by the VA was retaliatory. See, e.g., Cowan v. Jackson Hosp. & Clinic, Inc., 572 F. Supp. 2d 1286, 1289 (M.D. Ala. 2008) (cited sources omitted).

The elements of the prima facie case of retaliation are (1) protected activity, (2) adverse employment action, and (3) a causal link between the protected activity and the adverse action. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). Here, the parties do not dispute that Plaintiff engaged in protected activity and suffered adverse employment actions. The third element is in dispute.

A plaintiff must establish that the decision-makers were aware of the protected conduct and that the protected activity

and the adverse action were not wholly unrelated. McCann v. Tillman, 526 F.3d 370, 1376 (11th Cir. 2008); Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999). Causation may be established by showing close temporal proximity between the statutorily protected activity and the adverse employment action. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).

In this case, Plaintiff initiated an EEO process in August 2010 arising out of his placement on paid administrative leave. The first adverse action against him occurred one year later when he was placed in Building Six upon his return from leave. The next adverse action does not occur for another several months when his clinical privileges were extended for only three months. Thus, there is no temporal proximity in this case in relation to the August 2010 EEO activity. Moreover, Plaintiff has offered no evidence or even cogent allegation of what decision-maker knew what and at what time to help establish any causation.

Plaintiff next filed a formal EEO charge on July 20, 2012, following a suspension of privileges after the OPPE process revealed competency issues. Immediately thereafter, Plaintiff had limited privileges reinstated and he was sent to Charleston for training. The next *adverse* employment decision was on November 9, 2012, when he was told he was no longer a

member of the medical staff. Again, Plaintiff fails to allege let alone show that a decision-maker knew of the EEO activity and the events are not so temporally related that this Court can infer a causal element.

Even if Plaintiff could establish the causal element, the VA's actions are supported by legitimate reasons. Thus, the burden of production shifts to Plaintiff to establish pretext, which he may do by either producing evidence sufficient to permit a reasonable fact finder to conclude that a retaliatory reason more than likely motivated the adverse employment action or demonstrate that the VA's proffered reason for the employment action is not worthy of belief. See Burdine, 450 U.S. at 256. In this regard, Plaintiff has presented no evidence of a retaliatory motive on any decision maker's part, and as discussed in the prior section, Plaintiff has failed to offer evidence that would rebut the VA's legitimate, non-discriminatory reasons for its employment decisions. Accordingly, the VA is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

3. *Hostile Work Environment*

A hostile work environment claim is a species of action available under Title VII, founded upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation and quotations omitted). In this case, Plaintiff has wholly failed to show the type of harassment necessary to establish a hostile work environment. The VA is entitled to summary judgment on Plaintiff's hostile work environment claim.

C.  Due Process Claim

Throughout Plaintiff's pleadings and briefs, he generally contends that the VA did not follow proper protocol or policy in its implementation of performance-based peer reviews or in the suspension or limitation of clinical privileges. Plaintiff has offered no proof thereof. Plaintiff also contends that his due process rights were violated in the amount of time taken to effectuate his removal from federal service. Plaintiff has offered no proof that the delay violated any particular process. In sum, Plaintiff has not brought forth any particular administrative or statutory remedy which he was denied. Accordingly, Plaintiff has not provided any basis for a due process claim.[1]

To the extent Plaintiff is attempting to assert a federal constitutional claim in this case, this Circuit has counseled

---

[1]  Plaintiff's reference to Title VII does not move the ball forward because Title VII does not provide a remedy for the denial of due process *not based on race or other proscribed classes*. See Grier v. U.S. Army Forces Command, Ft. McPherson, Ga., 574 F. Supp. 183, 183 (N.D. Ga. 1983).

against allowing Bivens[2] suits in the context of a federal employer-employee relationship. In Bush v. Lucas, 647 F.2d 573 (5th Cir. 1981), aff'd, 462 U.S. 367 (1983),[3] a case in which a federal employee brought suit against his immediate supervisor for violation of his First Amendment right of free speech, the circuit court noted:

> [I]n this case the unique relationship between the Federal Government and its civil service employees is a special consideration which counsels hesitation in inferring a Bivens remedy in the absence of affirmative congressional action. The role of the Government as an employer toward its employees is fundamentally different from its role as sovereign over private citizens generally. . . . This special relationship affects not only the substantive rights of public employees, but also the way in which an aggrieved employee can assert and redress his rights in the employment context. Consistent with the notion that the Government should have wide latitude and control over its employees, Congress, rather than the Courts, has traditionally carried the burden of regulating the Government employer-employee relationship.

Bush, 647 F.2d at 576. To this end, the circuit court pointed to the protection provided by the notice, review and appeals procedures contained in the Civil Service Reform Act of 1978, 5 U.S.C. § 7501 *et seq.* and dismissed the federal employee's constitutional claim. Id. at 576-77.

---

[2] In Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388 (1971), the United States Supreme Court expanded the scope of federal question jurisdiction to include the independent right to sue federal officers who have violated a person's constitutional rights.
[3] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

In consideration of the vagueness of Plaintiff's due process claim and because such claim is not cognizable under Bush v. Lucas and its progeny, the VA is entitled to summary judgment on any constitutional due process claim.

## IV. CONCLUSION

Upon the foregoing, Defendant's motion for summary judgment (doc. no. 24) is **GRANTED**. The Clerk is instructed to **CLOSE** this case and **ENTER JUDGMENT** in favor of Defendant.

**ORDER ENTERED** at Augusta, Georgia, this 19th day of January, 2018.

UNITED STATES DISTRICT JUDGE